# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FILED
SEP 0 3 2009
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By _____

| | |
|---|---|
| CHARLIE S. HANCOCK,<br>　　　　　Appellant | : <br> : <br> : |
| v. | : 　Civil Action No. 1:09CV622 <br> : |
| SHIRLENE LETH RENSHAW,<br>　　　　　Appellee. | : <br> : |

On Appeal From the Decision of the United States Bankruptcy Court
for the Middle District of North Carolina
Greensboro Division

IN RE:

William Carrick Renshaw, III
Shirlene Leth Renshaw,
　　　　　　　Debtors.
Case No. 06-11028C-13G

Shirlene Leth Renshaw,
　　　　Plaintiff

　　　v.

Charlie S. Hancock,
　　　　Defendant.

Adversary No. 07-2055G

## BRIEF FOR APPELLANT

Charlie S. Hancock, *pro se*
P.O. Box 1268
Lexington, NC  27293

# TABLE OF CONTENTS

BASIS OF APPELLATE JURISDICTION............................................iii

ISSUES PRESENTED and STANDARD OF REVIEW..............................iv

INTRODUCTION.......................................................................1

STATEMENT OF THE CASE.........................................................1

I. Factual History....................................................................1

II. Procedural History...............................................................5

III. Renshaw's Undisputed Gains From These Transactions...................6

ARGUMENT............................................................................7

I.    The Court Ignored the Principles It Claimed to be
      Following In Order to Find Conversion....................................7

II.   Renshaw Was Not Damaged by This So-Called Conversion.........10

III.  The Bankruptcy Court Failed to Find Facts
      Supporting an Unfair Trade Practice Occurred.........................11

IV.   The Award of Treble Damages and Attorneys Fees Was Unjustified...........15

V.    The Bankruptcy Court Imposed Damages On the Wrong Party................16

CONCLUSION.........................................................................18

# TABLE OF AUTHORITIES

Statutes

N.C.G.S. § 44A-1 *et seq*..................................………...............................................9, 10

North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"),
N.C.G.S. § 75-1.1 *et
seq*...............................................................................................……....1, 12

Judicial Decisions

*Allied Distribs., Inc. v. Latrobe Brewing Co.,*
847 F.Supp. 376 (E.D.N.C.1993).......................……………………………...........13

*Bartlett Milling Co., L.P. v. Walnut Grove Auction and Realty Co., Inc.,*
665 S.E.2d 478 (N.C.App. 2008)....................................................…....................8, 13, 14

*Branch Banking & Tr. Co. v. Thompson,* 107 N.C.App. 53,
418 S.E.2d 694, *disc. rev. denied,* 332 N.C. 482, 421 S.E.2d 350 (1992)..............13

*Business Cabling, Inc. v. Yokeley,* 182 N.C.App. 657,
643 S.E.2d 63 (N.C.App. 2007).................……………………………………….......13

*Dalton v. Camp,* 548 S.E.2d 704 (N.C. 2001)....................................................………......12

*Lake Mary Ltd. Partnership v. Johnston,* 551 S.E.2d 546 (N.C.App. 2001)............8

# BASIS OF APPELLATE JURISDICTION

This district court has jurisdiction over this appeal from the bankruptcy court under 28 U.S.C. § 1334.

# ISSUES PRESENTED and STANDARD OF REVIEW

1. Whether a vendor who enters into a layaway sales contract with a customer for certain equipment, and then later allows that customer to take the as yet unpaid for equipment on a long-term loan, wrongfully converts that equipment when the customer, who has ceased making payments, returns the equipment because it needs repairs and instead takes other equipment equal in value to the payments already made?

This is a question of law to be reviewed *de novo*.

2. Whether a vendor who enters into a layaway sales contract with a customer for certain equipment, and then later allows that customer to take the as yet unpaid for equipment on a long-term loan, engages in an unfair trade practice under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1.1 *et seq.* when the customer, who has ceased making payments, returns the equipment because it needs repairs and instead takes other equipment equal in value to the payments already made?

This is a question of law to be reviewed *de novo*.

## INTRODUCTION

In the proceedings below, the bankruptcy court in essence held that plaintiff and debtor, Shirlene Leth Renshaw, was entitled not only to pay less than full price to the High Point Sewing and Vacuum Center for one sewing machine worth several thousands of dollars but was entitled to receive another one for free—and on top of that, to add treble damages and attorneys fees. Appellant, Charlie S. Hancock—not even the proper party to have been sued here, since he does not own the store in question—can only hope this Court will remedy this strange miscarriage of justice.

## STATEMENT OF THE CASE

Shirlene Leth Renshaw filed an adversary action against appellant, Charlie S. Hancock, seeking turnover of property. A hearing was held in which the bankruptcy court entered judgment for Renshaw and against Hancock individually, although he was not even a party to the underlying transaction, with actual damages of $4,800.00, to which treble damages under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1.1 *et seq.* were applied, for total damages of $14,400.00, as well as attorneys fees of $4,114.00, plus interest and costs

## I.    Factual History

The following factual history is based on undisputed facts agreed upon by

1

both parties as reflected in the opinion of the bankruptcy judge (herinafter, "B.J. Opinion"). Though there were facts in dispute, none of these are relevant to the resolution of the legal issues.

Appellant, Charlie Hancock, is the primary shareholder of Charlie Hancock, Inc. ("CHI") a close corporation which owns and operates High Point Sewing and Vacuum Center ("HPSVC" or "the store"). Appellee Shirlene Renshaw's ("Renshaw") husband was an employee at HPSVC, so when Renshaw sought to purchase a rather expensive sewing machine from HPSVC, efforts were made to be accommodating and helpful to her.

On December 20, 2004, it is undisputed that Renshaw and HPSVC (not Hancock individually) entered into a layaway agreement in which Renshaw would, for a purchase price of $6,000, purchase a Baby Lock Ellegante sewing/embroidery machine. Renshaw made payments on the machine, and HPSVC set it aside for her pending full payment. As the court below noted, the parties agreed this was a true layaway transaction, "in which the Plaintiff [Renshaw] would make payments on the Ellegante, but would not take possession of the Ellegante until the purchase price had been paid in full." (B.J. Opinion at 2).

Renshaw made some payments over the next year, and HPSVC kept the machine on layaway for her. However, in late November, 2005, Renshaw came to the store seeking permission to take the machine home with her to work on sewing projects she wanted to complete, even though it was far from paid for. Although

2

the parties disputed exactly what happened next, the court below found "that the Plaintiff took possession of a new Ellegante, to which Defendant [the owner of HPSVC, CHI, misidentified by the court below as Charlie Hancock the individual] intended to retain title, with the Plaintiff to continue making installment payments of $300 per month to complete the purchase." (B.J. Opinion at 6).

Renshaw did not continue to make those payments. She ceased paying for the machine she wanted to buy in June of 2006. At that time, even including a credit of $900 for another sewing machine she had sold back to HPSVC, she still owed $1,029.09, as the court below acknowledged. (B.J. Opinion at 4). Although she stopped paying for the Ellegante, though, Renshaw kept it and continued to do work on it.

In fact, she did so much work on the machine she broke it, requiring her to bring it into the HPSVC store to have it repaired. She did so on September 16, 2006, eleven days after she filed a Chapter 13 bankruptcy petition.

On September 23, 2006, HPSVC told her that the machine was in need of still further repairs. (B.J. Opinion at 4). HPSVC also expressed concern that she had not been paying for the machine, and had filed bankruptcy and listed the store as a creditor suggesting to the store she did not intend to pay for the machine. Again, there is as dispute about exactly what happened next, but as the parties agree and the court below specifically found, Renshaw took home another machine (the "Esante") worth approximately the same amount of money as she had already

3

paid or been credited for, and she began to use it to complete the large order of sewing she was working on. (B.J. Opinion at 5).

Though the bankruptcy judge seemed not to be aware of the significance of the fact, and certainly did not incorporate it into his analysis in any way, the key fact about what happened in September 2006 is that Renshaw took home a machine worth the same amount of money as she had paid to HPSVC—a nearly $5,000 machine—and *she kept it and has never returned it to HPSVC!* (See B.J. Opinion at 5, noting that Renshaw's attorney wrote to HPSVC in February of 2007—five months later—and offered to return the Esante machine and "allow" HPSVC to have a claim against her in bankruptcy). To date, Renshaw has never returned the Esante. At the hearing, Renshaw admitted she still has the Esante in her possession.

Renshaw contended that the Esante was inadequate for her needs, and that she had to purchase another Ellegante (this purchase is the basis of her claim for damages). Given that she could have obtained the Ellegante she used and broke after it was repaired for only about $1,000 and the return of the Esante, she never explained (and the court below seemed not to care) why she chose to "acquire another Ellegante machine from another source," (B.J. Opinion at 14) nor did she explain why, if the Esante machine was not up to her requirements, she has never given it back to HPSVC.

Before suit was brought, then, the store had lost money already on this

4

transaction. Although Renshaw only paid the equivalent of the Esante's sales price, she had the use for a full ten months of a more expensive sewing machine, the Ellegante, which the store was forced to bear to cost of repairing when she brought it in after using it for those ten months. She then left the store with the Esante, which she kept, giving her full value for her money, but leaving the store to bear the losses of the damaged Ellegante she left behind.

## II.   **Procedural History**

On November 9, 2007, after paying almost $5000 to HPSVC and receiving and choosing to keep a sewing machines worth approximately that amount, Renshaw filed an adversary action against Charlie Hancock as an individual (though her dealings were with HPSVC and therefore with CHI) demanding "turnover" of the value of yet another sewing machine, on the apparent theory she was entitled to two for the price of one.

After a hearing in which Hancock appeared unrepresented against Renshaw's attorney, the bankruptcy court not only found that Renshaw could keep the Esante machine free of charge but that she could recover as actual damages essentially all the money she paid to HPSVC, and on top of that found that HPSVC had engaged in an unfair trade practice under the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA), N.C.G.S. § 75-1.1 *et seq.* and imposed treble damages and attorneys fees.

5

### III.   Renshaw's Undisputed Gains From These Transactions

To sum up, then—Renshaw either paid or was credited with a total of not quite $5,000 to HPSVC.  In return,  she had the use of a $6,000 machine for ten months, and she made extensive use of that machine.  When she broke it, she turned it in and did not have to pay to have it repaired; instead, she walked away with, a machine worth almost $5,000 which she kept.  Then she convinced the court below that she should also get the value of the machine she used and broke in "actual" damages for "conversion—giving her an extra $4,800.  Thus, she in essence obtained a sewing machine, the Esante, for free.

Beyond that, however, even though Renshaw came out ahead in the underlying deal, the bankruptcy court imposed treble damages, totalling another $9,600 (for a damages total of $14,400.00) and attorneys fees in an additional $4,114.00, as well as interest and costs.

## ARGUMENT

The key error in the bankruptcy court's analysis appeared to have been the judge's complete failure to appreciate the undisputed fact that Renshaw accepted and has continued to posess and use a sewing machine she took from HPSVC that is worth all the money she paid to the store. As will be seen below, every one of the judge's errors flows from that inexplicable oversight.

## I.     The Court Ignored the Principles It Claimed to be Following In Order to Find Conversion

The basis of the judgment against Charlie Hancock was the bankruptcy court's finding that the Ellegante machine which Renshaw borrowed while paying for it on lawaway actually became hers, and therefore, the store's actions in September of 2006 were "conversion." The only way the court below could have found conversion, even though HPSVC was (as the bankruptcy court acknowledged) operating under the assumption it had title to the machine which was still on layaway, was to find that when HPSVC allowed Renshaw to borrow the Ellegante the transaction became, not a layaway, but a credit sales transaction in which Renshaw took title and HPSVC acquired the right to take a security interest.[1] The court below reasoned that this transformation of the deal took place irrespective of the

---

[1]    This was of course an unusual favor, not one that a normal customer would have received. However, since Renshaw"s husband was an employee of the store, the store did her this special favor. As the court below made clear, no good deed goes unpunished.

parties' intent because "North Carolina courts 'regard the substance of a transaction, rather than its outward appearance, as controlling.'" (B.J. Opinion at 6).

Unfortunately, the bankruptcy court failed to apply this principle consistently. If, when the store allowed Renshaw to take the machine even though it did not intend to transfer title, the machine in fact became hers, then when Renshaw took the Esante machine and kept it, she agreed to that new transaction too—instead of still owing more than $1,000 on the Ellegante being repaired, she accepted a substitute machine that she owned free and clear. Renshaw's protestations that she did not mean to accept a substitute should be just as unavailing as the store's protestations that in doing Renshaw the favor of loaning her a machine it did not intend to give up title. The substance of the transaction was clear—Renshaw, who no longer could or would pay the full price of the Ellegante accepted another sewing machine in its place.

There are two essential elements are necessary in a claim for conversion: (1) ownership in the plaintiff, and (2) a wrongful conversion by the defendant. *Bartlett Milling Co., L.P. v. Walnut Grove Auction and Realty Co., Inc.*, 665 S.E.2d 478 (N.C.App. 2008); *Lake Mary Ltd. Partnership v. Johnston*, 551 S.E.2d 546 (N.C.App. 2001). In this case, neither element is clear. As the court below acknowledged, the arrangement to purchase began as a layaway, in which the store would retain title to the goods to be purchased until all payments were made, and

8

at the court below further found that as far as the store intended, this arrangement never changed. Moreover, when the store asserted its title to the Ellegante in September of 2006, stating the store would not loan the machine again but would keep it on layaway until fully paid off, Renshaw accepted another machine instead, the Esante, which she still possesss and uses. Thus, the substance of the transaction appeared to be confirmed—rather than wait to own the Ellegante, she was willing to accept the Esante so that she could pay less.

Moreover, the Ellegante was brought in to the store in September of 2006 needing repairs. If, as the court below found, the Ellegante was no longer a loaner which the store owned, bur rather Renshaw's property, then of course the store would charge her for the repairs to her property. Under N.C.G.S. § 44A-1 *et seq.*, a repair shop obtains a possessory lien against the property left for repairs, and if the repairs are not paid for, that lien can be enforced by sale.

Under N.C.G.S. § 44A-2,

> Any person who tows, alters, *repairs*, stores, *services,* treats, or improves personal property other than a motor vehicle or an aircraft in the ordinary course of his business pursuant to an express or implied contract with an owner or legal possessor of the personal property has a lien upon the property… [and] [t]his lien shall have priority over perfected and unperfected security interests.

This lien arises "when the lienor acquires possession of the property." N.C.G.S. § 44A-3. If the repair charges are not paid, the lienor has a right to obtain payment by sale of the property. N.C.G.S. § 44A-4.

Renshaw never paid for the repairs on the Ellegante, and has never alleged to

9

have done so. Therefore, if, as the court below found, the Ellegante was her property, she had failed to prove that the store retaining the Ellegante was "wrongful conversion," given the store's possessory lien under N.C.G.S. § 44A-1 *et seq.* The store obtained this lien when it acquired possession of the Ellegante, *see* N.C.G.S. § 44A-3, and it never relinquished it. Instead, Renshaw relinquished her claim to possession by accepting a working Esante machine in lieu of the more expensive Ellegante for which she was unwilling to finish paying the purchase price and also for which she was unwilling to pay the repair charges.

Another point, too, is that if the store "converted" Renshaw's property by keeping the Ellegante, Renshaw converted the store's property by keeping and using the Esante. While the store has a valid possessory lien against the Ellegante, Renshaw has no claim of right to the Esante at all—unless she admits that she accepted it in return for counting her layaway payments towards buying it, rather than the Ellegante she was unable to finish paying for.

Of course, the store never tried to assert this lien, not even in the hearing below, because it considered the Ellegante to be its own property, still being held on layaway. If, however, Renshaw wants to claim the Ellegante was hers, she has to accept the responsibilities as well as the benefits of ownership, and that includes responsibility for paying for the repairs. She also would have to accept the fact that there is a repairman's possessory lien.

On the other hand, if Renshaw has title to the Ellegante, then surely the

Esante still belongs to the store. If she claims the store converted her Ellegante (which was damaged and in need of repairs when the store obtained possession) then she must have converted the store's Esante machine (which was functional and working when she took it home).

## II.    Renshaw Was Not Damaged by This So-Called Conversion

Renshaw was not damaged by this alleged conversion. First, she not only had use of the Ellegante loaner for nearly a year, but she wound up with a sewing machine worth the money she had paid into the layaway. She had shown herself unwilling or unable to pay for the Ellegante, and she was unable to pay for the repairs to the machine that she had damaged. Therefore, instead of paying repair costs she could not afford to re-obtain possession of the Ellegante machine, and then continue to have a debt of over $1,000 to pay off, she obtained another machine free and clear.

At the very least, the value of that machine, the Esante, must be discounted against the damages awarded the Ellegante. The bankruptcy court awarded $4800 for the actual damages for the "conversion" of the Ellegante; and the Esante is worth approximately that amount. If that fact is taken into account, Renshaw could have suffered no damages.

## III.    The Bankruptcy Court Failed to Find Facts
## Supporting an Unfair Trade Practice Occurred

The bankruptcy court misperceived and misapplied the Unfair or Deceptive

11

Trade Practices Act (UDTPA) and ignored the import of its own factual findings to impose liability on appellant Charlie Hancock. To see why, first it is important to remember exactly what the court below and the parties all agree happened. The court below found that Hancock's store believed it retained title in the Ellegante machine (B.J. Opinion at 6). Believing the machine belonged to the store, and knowing Renshaw had ceased making payments towards buying the machine, the store instead gave her an Esante machine free and clear, which she retained and has never returned, without making any further payments. She paid almost $5,000, and in return she got to use a $6,000 machine for ten months before taking home her own $5,000 machine forever.

Assuming that this was "conversion," there is no way it could be an unfair trade practice. The finding that it was one required the court below to ignore the clear language found in the very North Carolina Supreme Court opinion upon which it allegedly relied. The bankruptcy court cited *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) for the elements of a *prima facie* claim for unfair trade practices, which require a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. (B.J. opinion at 9). However, the court below ignored the North Carolina Supreme Court's admonition that these three elements are *not enough*, by themselves, to justify UDTPA liability. To the contrary, the *Dalton* court stated, "Moreover, '[s]ome type

12

of *egregious* or *aggravating* circumstances must be alleged and proved before the [Act's] provisions may [take effect].'" *Id.,* quoting *Allied Distribs., Inc. v. Latrobe Brewing Co.,* 847 F.Supp. 376, 379 (E.D.N.C.1993) (emphasis added); and also citing *Branch Banking & Tr. Co. v. Thompson,* 107 N.C.App. 53, 62, 418 S.E.2d 694, 700, *disc. rev. denied,* 332 N.C. 482, 421 S.E.2d 350 (1992)(italicization in the original). The italicization in the quoted language shows the emphasis that the North Carolina court placed in the need to show something egregious or aggravating, but in its discussion of the UDTPA, the court found no such egregious or aggravating circumstances. (B.J. opinion at 9 –13). Instead, it analyzed whether the store's mistaken, good faith retention of the Ellegante could be conversion. For nearly two pages, the bankruptcy court engaged in serial quotations from decisions from other jurisdictions that "mistake, good faith and due care" are not defenses, that "conscious wrongdoing" is not required to find conversion, and "complete innocence" and "perfect good faith" are not defenses. (*See* B.J. Opinion at 11-13). In so doing, the bankruptcy court showed exactly what sort of "conversion" it had found happened—a conversion that was based on good faith, honest mistake, and an accidental transformation of a layaway sale into something else.

Irrespective of the dubitable proposition that the store's good faith retention of a machine it thought it owned was "conversion," a decision from just last year *clearly rejected* the proposition that merely finding that a defendant committed conversion is sufficient to impose UDTPA liability. In *Bartlett Milling Co., L.P. v.*

13

*Walnut Grove Auction and Realty Co., Inc.*, 665 S.E.2d 478, 487 (N.C.App. 2008),

the North Carolina Court of Appeals plainly stated that:

> Our review of the stipulations and jury findings in this case lead us to the conclusion that they do little more than support the claim for conversion, which already had been decided by directed verdict, and *do not establish the additional egregious, immoral, oppressive, unscrupulous, or substantially injurious acts needed to impose the heightened penalty of unfair and deceptive trade practices.*

(Emphasis supplied). Therefore, the court affirmed the trial court's decision to

grant partial summary judgment in favor of a judgment creditor on the issue of

liability on a conversion claim, but at the same time deny its UDTPA claim.

Certainly, here there could be no finding of some additional egregious or

immoral act—not only did the store provide Renshaw with a machine worth as

much as she had paid, but it did not charge her for borrowing the Ellegante for ten

months and using it so hard it required extensive repairs. She used that borrowed

machine for ten months, beat it up, and then took home a replacement worth what

she had invested in the Ellegante. To claim those actions were "oppressive"

requires a serious distortion of the meaning of that word. Where, as here, there are

no aggravating circumstances, there can be no unfair trade practice. *See, e.g.,*

*Business Cabling, Inc. v. Yokeley,* 182 N.C.App. 657, 643 S.E.2d 63 (N.C.App.

2007)(reversing the trial court's imposition of UDTPA liability). In that case, the

installer of computer cables sued a former employee's, alleging several claims,

including claim for unfair and deceptive trade practices. The Court of Appeals held

that the employee's company's acceptance of bids that the former employee had

14

prepared in his own name while still working for installer did not constitute unfair and deceptive trade practice, and his company's allegedly deceiving electronic communications to installer regarding cabling projects' start dates and whether installer's bids would be accepted did not constitute an actionable unfair and deceptive trade practice. The court quoted *Dalton*, stating "Moreover, *some type of egregious or aggravating circumstances must be alleged and proved before the [Act's] provisions may [take effect].*" *Id.* at 663 (italicized emphasis in the original).

Even accepting the dubious proposition that there was a conversion here, the court below did not even attempt to make the findings of fact necessary to justify the further imposition of unfair trade practices liability.

## IV.   **The Award of Treble Damages and Attorneys Fees Was Unjustified**

Even if the court below had been correct in finding an unfair trade practice, it erred in finding this case justified treble damages and attorneys fees. The error is plain from this summing up in the bankruptcy judge's opinion, where he stated "Defendant had multiple opportunities to settle the matter before trial, but continued to unreasonably contend the he would accept nothing short of full payment in exchange for Ellegante...." (B.J. Opinion at 15).   Several things are apparent from that revealing sentence.

First, the bankruptcy judge must have forgotten that the store had already made a very generous offer, and Renshaw accepted it.  The store gave Renshaw an

15

expensive sewing machine, the Esante, free and clear, and did not ask or expect Renshaw to pay for the repairs on the machine she broke. It might be unreasonable to take almost $5,000 and then offer neither to give some of the money back or otherwise give value for those payments, but of course Renshaw received a great deal for her payments. She not only received and kept and continues to use a sewing machine, the Esante worth the amount of layaway payments she made, but in effect she had rent free use of the Ellegante for ten months, which she took such advantage of that she wore the machine out, so that it required repairs—which she has never paid for. Second, the bankruptcy judge appears to believe that it is wrong to insist on being paid the agreed upon contract price. Surely the law should not countenance using litigation to extort concessions on contracted upon sales prices. Having given Renshaw one sewing machine, the Esante, apparently the court believed it was the store's obligation to give her another one free of charge—a total of about $11,000 worth of merchandise for less than $5,000 in payments.

In any case, where there is no unfair trade practice there is no justification for treble damages or attorneys fees under the UDTPA. As pointed out above, here there was no unfair trade practice, so the UDTPA simply does not apply.

## V. The Bankruptcy Court Imposed Damages On the Wrong Party

Acting *pro se*, appellant was unaware at the time of trial that the bankruptcy court had failed to understand that appellant is not the owner of

16

the store with which Renshaw had her dealings. Although it may be too late to so plead, appellant respectfully requests that the court take notice of the fact, set forth in the accompanying documents (see Exhibit 1) that the store is owned by Charlie Hancock, Inc., a North Carolina corporation, not by appellant Hancock individually, and Hancock individually should not be liable for any claims in this case.

## CONCLUSION

For a little less than $5,000, Shirlene Renshaw has purchased not only an Esante sewing machine well worth that amount, but had the full use of an even more expensive sewing machine for nearly a year for no additional money. Putting aside all issues of layaways that unintentionally transform into entirely different sorts of contracts, the simple equities of this situation mandate that the judgment here be set aside. For all the reasons stated above, appellant Charlie Hancock respectfully requests that this Court reverse and set aside the judgment of the bankruptcy court, allowing Renshaw to keep the Esante machine she bought but not imposing still further losses on Charlie Hancock, or Charlie Hancock, Inc., or the High Point Sewing and Vacuum Center.

Respectfully submitted,

Charlie S. Hancock, *pro se*
P.O. Box 1268
Lexington, NC 27293

Dated: September 3 , 2009

18